*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0120p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

LA QUINTA CORPORATION; BAYMONT
FRANCHISING LLC,

        *Plaintiffs-Appellees,*

     *v.*

HEARTLAND PROPERTIES LLC; DAVID W.
ADAMS; BETTY L. ADAMS,

        *Defendants-Appellants.*

No. 08-6368

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 05-00328—Charles R. Simpson, District Judge.

Argued: August 3, 2009

Decided and Filed: April 28, 2010

Before: SILER, GIBBONS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** George R. Carter, GEORGE R. CARTER, ATTORNEY AT LAW, Louisville, Kentucky, for Appellants. Joel D. Siegel, SONNENSCHEIN NATH & ROSENTHAL LLP, Los Angeles, California, for Appellees. **ON BRIEF:** George R. Carter, GEORGE R. CARTER, ATTORNEY AT LAW, Louisville, Kentucky, for Appellants. Joel D. Siegel, SONNENSCHEIN NATH & ROSENTHAL LLP, Los Angeles, California, David R. Simonton, SONNENSCHEIN NATH & ROSENTHAL LLP, San Francisco, California, Theresa A. Canaday, J. Kendrick Wells, IV, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellees.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. In this action alleging breach of a hotel franchise agreement and federal trademark infringement, defendants Heartland Properties LLC, David W. Adams, and Betty L. Adams appeal the district court's denial of discovery-related

motions, grant of summary judgment in favor of plaintiffs La Quinta Corporation and Baymont Franchising LLC, and the award of liquidated and treble damages to Baymont. We affirm.

I.

In 1994, Heartland Properties LLC and its guarantors, David and Betty Adams (collectively referred to as "Heartland"), entered into a franchise agreement with Budgetel Franchises International, Inc., the corporate predecessor to Baymont Franchising LLC ("Baymont"), to operate a Budgetel Inn in Shepherdsville, Kentucky. Baymont is a wholly-owned subsidiary of La Quinta Corporation ("La Quinta").[1]

The License Agreement granted Heartland a license to operate the Shepherdsville Inn using Baymont's unique internal operating "System" which included, inter alia, Baymont's federally-registered trademarks, logos, reservation system, and other intellectual property. The Agreement required Heartland to maintain certain "System Standards" for its facilities, technology, and service, and gave Baymont the right to "amend, modify, delete or enhance any portion of the System." Heartland agreed to carry the costs for compliance with these standards, including any updates in computer hardware and software.

Specifically, the License Agreement provided that Baymont would maintain a reservation system that "in its sole discretion, [it] determines will best serve the System"; conversely, Heartland "agree[d] to participate in the Reservation System" and to "bear . . . telephone line connection charges, supply costs and other such expenses of meeting System Standards and participating in the Reservation System." In addition, Heartland was obligated to pay monthly "Recurring Fees" to Baymont. These fees included a

---

[1]Budgetel Franchises International, Inc. was a wholly-owned subsidiary of Budgetel Inns, Inc., which in turn was a subsidiary of The Marcus Corporation. Budgetel subsequently changed its name to Baymont Franchises International, Inc., and thus, when the parties executed amendments to the License Agreement in October 2001 and September 2003, Baymont was the named licensor. In September 2004, La Quinta Corporation acquired the assets of the limited service lodging division of The Marcus Corporation, including the Baymont hotel franchise; however, La Quinta did not merge with Baymont, and Baymont did not assign its rights under the License Agreement to La Quinta.

royalty of five percent of Heartland's gross room revenues, as well as marketing and reservations assessments.

Pursuant to Section 13.b of the License Agreement, Baymont could terminate the franchise arrangement "at any time . . . if: (i) "Licensee fails fully to remedy specified Agreement breaches within 30 days of [Baymont's] written notice[;] . . . (vi) Licensee fails to pay its debts as they fall due; . . . or (xi) with good cause, for any other reason." In the event of Heartland's failure to "operate[] under the System for any reason [] including, but not limited to, Section 13.b termination for Licensee's uncured default," Heartland agreed to pay liquidated damages to Baymont in "an amount equal to 100% of the aggregate Recurring Fees which accrued with respect to Inn operations during the immediately preceding 36 full calendar months[.]"  Heartland's right to use the System and all trademarks, signage, logos, and equipment ended immediately when the license term expired or was terminated earlier for any reason.  Additionally, upon termination of the franchise, Heartland "shall promptly pay all sums then owed to [Baymont]."

Heartland possessed the right to terminate the Agreement "by giving at least 12 months prior written notice to [Baymont], but only effective on . . . the tenth anniversary of the Opening Date [September 26, 2006] . . . ."

In the fall of 2004, Baymont adopted a new System Standard for computerized reservations known as the L.I.S.A. System, which necessitated the installation of updated computer hardware and software at its franchise hotels.  The L.I.S.A. System was designed to improve the centralized reservation system and ensure the integration of all of Baymont's franchisees into the shared reservation system used by Baymont's affiliates, La Quinta Inn & Suites and La Quinta Inn.  As part of the upgrade, Baymont required its franchisees to sign a software license agreement – the "L.I.S.A. Agreement" – pursuant to which franchisees' payments for the acquisition, installation, and initial training on the system were amortized over a period of 120 months, commencing upon installation of the new computer system.  Under the terms of the L.I.S.A. Agreement, Heartland was to pay a total of $35,000 over the ten-year period for L.I.S.A.-associated

costs. However, if the License Agreement expired or was terminated for any reason, Heartland would be obligated to pay in full the remaining balance owed for the L.I.S.A. System.

In October 2004, the Baymont Inns Franchise Advisory Council, consisting of representative Baymont franchisees, approved the adoption of the L.I.S.A. System. In late 2004, Baymont shipped the components for the L.I.S.A. System to Heartland, along with a copy of the L.I.S.A. Agreement. In January 2005, Baymont conducted a series of conference calls and training sessions with its franchisees to ease the transition to the new computer program. The parties disagree about the extent of Heartland's participation in these events. In February 2005, Baymont attempted to work with Heartland to bring it into conformance with the L.I.S.A. System, but installation was never completed because Heartland allegedly refused to provide Baymont with access to its facilities. It is undisputed that Heartland neither signed the L.I.S.A. Agreement nor made the L.I.S.A. System operational at its hotel.

Consequently, on February 24, 2005, Baymont sent a letter notifying Heartland that it was in default under Sections 5 and 7 of the License Agreement due to its failure to execute the L.I.S.A. Agreement and install the L.I.S.A. System. Baymont ordered Heartland to cure the default within thirty days, but Heartland failed to do so.

Heartland attributes its refusal to sign the L.I.S.A. Agreement to Baymont's failure to address its concerns, purportedly shared by other franchisees, about conflicts between the terms of the original License Agreement and the L.I.S.A. Agreement – precisely, the L.I.S.A. Agreement's effect on Heartland's non-renewal option at the ten-year anniversary date under Section 13.a of the License Agreement. Heartland also cites sloppy and disruptive installation of the computer infrastructure and related technical problems as factors in its decision not to sign the L.I.S.A. Agreement or participate in the L.I.S.A. System. Heartland claims that Baymont terminated the License Agreement before arrangements could be made for Heartland's representatives to attend any training seminars and before rescheduled work could be completed on the L.I.S.A. System.

On March 25, 2005, after unsuccessful attempts to resolve these controverted issues, Baymont notified Heartland by letter that its rights under the License Agreement would be terminated effective April 30, 2005.

On May 17, 2005, Heartland filed suit against La Quinta in the Kentucky state circuit court, alleging breach of the License Agreement and the implied covenant of good faith and fair dealing, and seeking injunctive relief. La Quinta removed the action to federal court, where it was ultimately consolidated with Baymont's separate action against Heartland.[2] Baymont's seven-count complaint averred federal trademark infringement and false designation of sponsorship under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), misappropriation of trade secrets, and breach of contract; Baymont also sought declaratory relief to prevent Heartland's continued use of Baymont's trademarks and intellectual property.

In February 2006, with the stipulation of the parties, the district court entered a preliminary injunction against Heartland, precluding further use of Baymont's name, trademarks, and System Standards. Discovery concluded on November 17, 2006, after an extension of the original discovery deadlines. An extended deadline for the filing of dispositive motions expired on January 5, 2007. On that date, the parties filed cross motions for summary judgment. In addition, Heartland filed three discovery-related motions – a motion to produce, a motion to compel, and a motion to reopen discovery. Heartland maintained that the failure of Baymont and La Quinta to cooperate with discovery and to identify all of their employees with knowledge of the dispute justified reopening discovery.

In an order entered on March 20, 2007, the magistrate judge declined to reopen discovery and denied Heartland's three discovery-related motions, citing Heartland's "entirely unacceptable" delays in the context of the current posture of the proceedings. Over Heartland's objections, the district court affirmed the magistrate's decision, and

---

[2]Following consolidation, the district court realigned the parties and denominated La Quinta and Baymont as plaintiffs and Heartland and the Adams as defendants. Heartland's action against La Quinta became a counterclaim and, following the realignment, Heartland added a counterclaim against Baymont.

thereafter granted summary judgment on all claims in favor of La Quinta and Baymont, and denied Heartland's cross motion for summary judgment.

The district court dismissed La Quinta from the action, finding that "[a]s the claims devolve solely into an analysis of the rights and liabilities under the license agreement, La Quinta [was] not a proper party to the action" because it was not shown to be a party to the License Agreement. With regard to Baymont's liability for breach of contract, the district court categorized the parties' dispute over the status of negotiations and the completeness of hardware and software installation as "immaterial" in light of the undisputed fact that Heartland failed to cure its default within the requisite thirty-day period under the License Agreement. The court explained:

> Heartland contends that Baymont breached the license agreement because its requirement that Heartland participate in and pay for the L.I.S.A. System hardware and software constituted an impermissible unilateral modification of the termination clause in the agreement. It argues that requiring it to sign the L.I.S.A. System License Agreement with the ten-year amortization provision essentially locked franchisees into their franchise agreement until the L.I.S.A. System was paid off. Heartland urges that this modified the termination clause because it would be required to pay any remaining balance for the unamortized portion of the L.I.S.A. System if it chose not to renew its franchise relationship with Baymont at the end of the contract period.
>
> Section 13.a providing for termination by Heartland on the tenth anniversary of the opening of its hotel remained unaltered by the adoption of the L.I.S.A. System and its attendant financial requirements. In accordance with its duties at and after termination, pursuant to Section 15.f, Heartland agreed in its license agreement to "promptly pay all sums then owed to [Baymont]." The unamortized portion of the L.I.S.A. System cost simply became one of the sums owed. Heartland's contention is merely that, because it was approaching its ten-year anniversary in 2006, it would constitute an expensive buy-out if it chose to terminate its franchise relationship, and thus it was unfair. However, it cannot and does not argue that the adoption of the L.I.S.A. System with its attendant costs was not anticipated and permitted by its agreement. Similarly, Heartland's contention that Baymont should have agreed to waive the unamortized portion of the cost is an argument without teeth inasmuch as Baymont did precisely what it was permitted to do under the

agreement, and was entitled to payment of all sums then owed upon termination of the agreement.

In sum, Heartland's sole defense to the claim for breach of the license agreement rests upon the assertion that Baymont defaulted on the contract and caused Heartland's non-compliance. As we reject the contention that Baymont committed any breach of the agreement, we will grant summary judgment in favor of Baymont on its claim of liability.

(Footnote omitted.) The court also granted summary judgment in favor of Baymont on its remaining claims against Heartland and the Adams.

In a separate order, the district court granted Baymont's motions for damages and attorney's fees and awarded the following sums: (1) $19,852.52 in unpaid "Recurring Fees" and accounts receivable that Heartland owed to Baymont under the License Agreement at the time of termination, plus prejudgment interest at the rate of eight percent per annum; (2) $111,325.37 in liquidated damages for early termination, as provided in Section 14.a of the License Agreement, plus prejudgment interest; (3) $117,866.16 in treble damages for willful, unauthorized use of Baymont's intellectual property in violation of the Lanham Act; and (4) attorney's fees pursuant to 15 U.S.C. § 1117(a) in an amount to be established by further order of the court.[3] Heartland now appeals.

## II.

Heartland first argues that the district court improperly denied the three discovery-related motions that it filed simultaneously with its summary judgment motion, nearly two months after the close of discovery. We disagree.

While "[i]t is well-established that the plaintiff must receive a full opportunity to conduct discovery to be able to successfully defeat a motion for summary judgment," a district court's decision denying further discovery is "generally unreviewable unless

---

[3] The matter of attorney's fees was referred to the magistrate judge. After Heartland filed its notice of appeal in this court, the district court adopted the magistrate judge's report and recommendation in its entirety and awarded Baymont $246,048.20 in attorney's fees and $8,835.74 in costs. The court denied Heartland's ensuant motion to alter, amend, or vacate the damages and attorney's fee awards.

the appellant has filed a Rule 56(f) affidavit or a motion that gives the district court a chance to rule on the need for additional discovery." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719-20 (6th Cir. 2004) (citations and internal quotation marks omitted).

We review the district court's decision precluding additional time for discovery for an abuse of discretion. *Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006) (citing *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196-97 (6th Cir. 1995)). "Factors that should be considered include when the moving party learned of the issue that is the subject of discovery, how the discovery would affect the ruling below, the length of the discovery period, whether the moving party was dilatory, and whether the adverse party was responsive to prior discovery requests." *Audi AG*, 469 F.3d at 541. "It is not an abuse of discretion for the district court to deny the discovery request when the party makes only general and conclusory statements [] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the [document] to be discovered." *Ball*, 385 F.3d at 720 (citation and internal quotation marks omitted).

The multiple reasons provided by the magistrate judge and district court for the denial of Heartland's motions are well founded and need no further reiteration. Heartland not only failed to comply with the requirements of Federal Rule of Civil Procedure 56(f), *see generally Singleton v. United States*, 277 F.3d 864, 872 (6th Cir. 2002), *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000), but also failed to adequately explain to the court its inability to obtain discovery in a timely fashion or the need to depose more individuals and obtain certain documents, including Baymont's privilege log and information concerning how other franchisees were treated, six weeks after the close of an already-extended discovery period. Heartland was not, as it claims, prematurely foreclosed from conducting discovery; it was simply dilatory in its discovery requests.

As the magistrate judge aptly observed, Heartland's own discovery conduct "[was] not unblemished," and "the relief requested by the discovery motions [was not

reconcilable] with Heartland's position on summary judgment – that no genuine issues of material fact preclude entry of a judgment in its favor on all claims." Thus, we find no abuse of discretion in the district court's decision denying Heartland's belated discovery motions.

III.

Heartland next argues that the district court's grant of summary judgment in favor of Baymont on its breach of contract counterclaim should be reversed. We conduct de novo review of a district court's summary judgment determination. *Med. Mut. of Ohio v. K. Amalia Enter. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). Summary judgment is appropriate if, taking the evidence in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c)(2). "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A "mere scintilla" of evidence, however, is not enough for the non-moving party to withstand summary judgment. *Id.* We review cross motions for summary judgment under this standard as well, evaluating each motion on its own merits. *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004).

Heartland contends that the L.I.S.A. Agreement effected "significant changes" and imposed additional demands on franchisees such as itself, beyond those contained in the License Agreement. Because these material changes were imposed without its written consent, Heartland asserts that Baymont anticipatorily breached the License Agreement, thereby excusing further performance on Heartland's part. Heartland focuses on several discrete provisions in the L.I.S.A. Agreement: the ten-year amortization period, the forum selection clause, a disclaimer of warranties and limitation of liability pertaining to the software, and Baymont's right to disable the software should the franchisee be in default.

To establish a cognizable breach of contract claim under Wisconsin law,[4] a plaintiff must prove "the existence, applicability and breach of a contract right." *Sch. Dist. of Slinger v. Wis. Interscholastic Athletic Ass'n*, 563 N.W.2d 585, 590 (Wis. Ct. App. 1997) (citation omitted). "[A] material breach by one party may excuse subsequent performance by the other." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 77 (Wis. 1996). "However, a party is not automatically excused from future performance of contract obligations every time the other party breaches . . . . [T]here must be so serious a breach of the contract . . . as to destroy the essential objects of the contract." *Id.* at 77-78 (citations and internal quotation marks omitted).

"'[T]he cornerstone of contract construction is to ascertain the true intentions of the parties as expressed by the contractual language.'" *Town Bank v. City Real Estate Dev., LLC*, 777 N.W.2d 98, 103 (Wis. Ct. App. 2009) (quoting *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 456 N.W.2d 359, 362 (Wis. 1990)). To ascertain the parties' intent, "a court must adhere to the plain meaning of the contract" if it is unambiguous. *Town Bank*, 777 N.W.2d at 104. "Words or phrases within a contract are only ambiguous when they are reasonably or fairly susceptible to more than one construction." *Heritage Mut. Ins. Co. v. Truck Ins. Exch.*, 516 N.W.2d 8, 10 (Wis. Ct. App. 1994) (citation and internal quotation marks omitted); *see also Town of Neenah Sanitary Dist. No. 2 v. City of Neenah*, 647 N.W.2d 913, 916 (Wis. Ct. App. 2002).

Heartland renews its primary argument, made to the district court, that the L.I.S.A. Agreement imposed a penalty on its right to terminate the franchise under Section 13.a of the License Agreement, because if it opted not to renew its contract on the tenth anniversary of its opening date, but before the L.I.S.A. amortization period ended, it would have to pay the remainder of the balance it owed for the L.I.S.A. System and thus would be charged for a reservation system that it was no longer using.

---

[4]Section 17.e of the License Agreement provides that "[t]his Agreement shall be construed in accordance with Wisconsin substantive law[.]" *See generally Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("When interpreting contracts in a diversity action, we [] generally enforce the parties' contractual choice of governing law.").

We agree with the district court, however, that Baymont's implementation of the L.I.S.A. System with its attendant costs was fully contemplated and permitted under the unambiguous terms of the License Agreement. Sections 5.a and 7.d of the License Agreement expressly gave Baymont the right to add, amend, and/or delete System Standards, including the reservation system, and required Heartland to participate in and bear such costs:

> 5. STANDARDS: Standards of quality and service associated with the System (collectively, "System Standards") shall at all times be subject to [Baymont's] supervision and control . . . . Licensee agrees, at its sole expense to comply with all such System Standards, and System Manuals and Policy Statements. Without limiting the foregoing:
>
> a.     Changes. [Baymont] shall have the right, from time to time to add, amend and/or delete System Standards, including without limitation for: . . . (iv) Inn technology (including for computer hardware and software for various applications, such as rooms management, records maintenance, accounting, and budgeting); and (v) Reservation System participation (including for the purchase or lease and maintenance of terminal and telephone equipment and service, and related computer hardware and software). [Baymont] may, in its sole discretion, permit deviations from System Standards, based on local conditions and/or [Baymont's] assessment of special circumstances.
>
> \* \* \*
>
> [7].d. Reservation System. [Baymont] shall . . . maintain a "Reservation System" with a distinctive national toll-free telephone access number for making reservations at System Inns, and/or such technological substitute(s) and/or supplements as [Baymont], in its sole discretion, determines will best serve the System. *Licensee agrees to participate in the Reservation System . . . [and] shall bear . . . supply costs and other such expenses of meeting System Standards and participating in the Reservation System.*

(Emphasis added.) Section 3.a of the License Agreement allowed Baymont to,

> by adoption or amendment of its "Systems Manuals" and/or "Policy Statements," amend, modify, delete or enhance any portion of the System, including any of the Marks, System Standards and the Prototype Package, as may be desirable, in the sole judgment of [Baymont], to

maintain or enhance the reputation of the System or improve System license marketability."

Consistent with these provisions, Baymont had the right to institute changes to its reservation system and require Heartland to conform to this new System Standard "at its sole expense." Indeed, David Adams admitted so during his deposition, conceding that under the terms of the License Agreement, Baymont had the right to charge Heartland for upgrades to the reservation system.

Moreover, the License Agreement stated that if it was "terminated for any reason," e.g., termination by Heartland under Section 13.a, Heartland was required to "promptly pay all sums then owed to [Baymont]." There is no inherent inconsistency, then, between the two agreements; rather, as the district court correctly determined, in the event the License Agreement was terminated, "[t]he unamortized portion of the L.I.S.A. System cost simply became one of the sums owed." Heartland's argument that the payment provisions of the L.I.S.A. Agreement materially altered the License Agreement so as to penalize Heartland's termination rights does not withstand scrutiny.

Other courts, in similar circumstances, have upheld the right of franchisors to make changes to their systems, sometimes at the expense of the franchisee, if authorized under the franchise agreement. For instance, in *Trail Burger King, Inc. v. Burger King of Miami, Inc.*, 187 So. 2d 55 (Fla. Dist. Ct. App. 1966), the Florida Third District Court of Appeal held, in the context of a declaratory judgment action, that a chain restaurant corporation could change certain standards, including an increase in the quantity of meat used to make hamburgers:

> The plaintiff argues that any changes in standards and specifications in the operation of its restaurant from those in existence at the time of the execution of the agreement would be a modification or amendment thereto. It is also argued that since the agreement provides for modification and amendment only by the written consent of both parties, the chancellor erred in allowing the defendant to make reasonable changes from time to time as circumstances may dictate.

> We have found that the chancellor was correct in determining that such changes are not modifications or amendments to the agreement, but were provided for in the agreement. It is clear from the language of the instrument that one of the objects is to provide uniformity among all franchised 'Burger-King' restaurants. A review of the clauses of the agreement summarized above reveals that this uniformity is accomplished by providing that the defendant set and maintain standards and specifications which the plaintiff must follow or suffer termination of the agreement. The chancellor has interpreted the agreement in accordance with the natural and ordinary meaning of the language employed.

187 So. 2d at 58; *see also Layton v. AAMCO Transmissions, Inc.*, 717 F. Supp. 368, 372-73 (D. Md. 1989) (granting summary judgment to franchisor on franchisee's claim for breach of a contractual duty of good faith, where "it [was] undisputed that [the franchisor] had the right under its agreement with [franchisees] to change the terms of the franchise unilaterally"); *Remus v. Amoco*, 794 F.2d 1238, 1241-42 (7th Cir. 1986) (holding that the defendant oil company did not violate its credit card contract with its franchisee-dealer by adopting a system-wide "discount for cash" program, even though the change was potentially detrimental to some dealers); *cf. Economou v. Physicians Weight Loss Ctrs. of Am.*, 756 F. Supp. 1024, 1028 (N.D. Ohio 1991) (granting franchisor preliminary injunctive relief requiring enforcement of covenant not to compete by franchisees, based in part on the franchisor's right under its contract to make changes in its diet program).

In sum, we reject Heartland's assertion that Baymont breached the License Agreement through its implementation of the L.I.S.A. System and insistence that Heartland adopt its new reservation system. Baymont did not breach the License Agreement, but Heartland did when it failed to comply with its contractual obligation to adopt new System Standards. The district court therefore did not err in granting

summary judgment in favor of Baymont, and denying Heartland's motion, regarding the parties' respective breach of contract claims.[5]

In light of this determination, Heartland's claims against Baymont for breach of the implied covenant of good faith and fair dealing, and La Quinta for intentional interference with a contractual relationship,[6] necessarily fail. Heartland has not shown that Baymont engaged in any overt acts or inaction that might be deemed bad faith conduct. *See Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 213 (Wis. Ct. App. 1995). In fact,

> where the contracting party complains of acts of the other party that are specifically authorized in their agreement, we cannot see how there can be any breach of good faith and fair dealing. Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a bad faith breach of that contract.

*M & I Marshall & Ilsley Bank v. Schlueter*, 655 N.W.2d 521, 525 (Wis. Ct. App. 2002) (citations and internal quotation marks omitted). *See also Howe v. Neenah Springs, Inc.*, No. 02-1657, 671 N.W.2d 864, 2003 WL 22254702, at *4 (Wis. Ct. App. Oct. 2, 2003) (unpublished table decision) ("The covenant of good faith and fair dealing cannot override a contract's express terms."); *cf. Travelers Ins. Co. v. Corporex Props., Inc.*, 798 F. Supp. 423, 425 (E.D. Ky. 1992) ("Although it is recognized that implied in each contract is a covenant of 'good faith and fair dealing,' such a covenant does not preclude a party from enforcing the terms of the contract. It is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained.") (internal citation omitted).

---

[5]Because Heartland fails to elaborate on how the other cited provisions of the L.I.S.A. Agreement materially altered or diminished any rights it enjoyed under the License Agreement, it has waived any such argument. *See In re Travel Agent Comm'n Antitrust Litigation*, 583 F.3d 896, 901 (6th Cir. 2009) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citing *United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008)).

[6]Wisconsin recognizes the common law claim for tortious interference with a contractual relationship. *See Hoey Outdoor Adver., Inc. v. Ricci*, 653 N.W.2d 763, 770 (Wis. Ct. App. 2002).

With respect to La Quinta's role in this matter, Heartland argues that "La Quinta was the party behind the actions to force Heartland . . . to sign the [L.I.S.A.] Agreement." We agree with the district court, however, that "[t]o the extent that Heartland contends that La Quinta 'interfered' with its ability to perform under the agreement, it contends, at the same time, that its acts were the acts of 'Baymont/La Quinta.' It does so to assert that their acts in connection with the L.I.S.A. System constituted a breach of the licensing agreement."[7] As we have determined that Baymont's actions in implementing the L.I.S.A. System were authorized under the License Agreement, Heartland has failed to establish that La Quinta "interfered" with its franchise relationship with Baymont.

## IV.

The district court awarded Baymont $111,325.37 in liquidated damages, using the following formula set forth in Section 14.a of the License Agreement:

> [I]f the Inn ceases to be operated under the System for any reason (including, but not limited to, Section 13.b termination for Licensee's uncured default . . . ), Licensee shall pay [Baymont] within 30 days following the effectiveness of such event, as "Liquidated Damages" (to compensate [Baymont] for lost revenues in an amount difficult to ascertain, and not as a penalty) an amount equal to 100% of the aggregate Recurring Fees which accrued with respect to Inn operations during the immediately preceding 36 full calendar months . . . .

Section 14.c of the License Agreement provides that Section 14.a does not apply if the licensee terminates the license term pursuant to Section 13.a, the non-renewal option at the ten-year anniversary of opening, which requires "12 months prior written notice to [Baymont]."

As in the proceedings below, Heartland does not dispute the calculation that $111,325.37 in liquidated damages was due under this thirty-six-month formula. Heartland instead argues that the award is unreasonable because a shortened period of

___

[7]Only from a very generous reading of Heartland's complaint can we extract a claim for tortious interference with contract against La Quinta.

loss should have been used as the basis for the liquidated damages award.  It reasons that because it had the right to terminate the License Agreement on September 25, 2006, and purportedly provided the requisite one-year advance notice of non-renewal, Baymont's maximum loss of royalties should be limited to the period of March 25, 2005 to September 25, 2006, or eighteen months.

Under Wisconsin law, liquidated damages provided for in a contract must be reasonable.  *Wassenaar v. Panos*, 331 N.W.2d 357, 361-63 (Wis. 1983).  WIS. STAT. ANN. § 402.718(1) states:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  A term fixing unreasonably large liquidated damages is void as a penalty.

In determining reasonableness, a court must "inquire into all relevant circumstances," *Wassenaar*, 331 N.W.2d at 361, and consider three factors:  (1) whether the parties intended to provide damages or for a penalty; (2) whether the injury caused by the breach would be difficult or incapable of accurate estimation at the time of entering into the contract; and (3) whether the stipulated damages are a reasonable forecast of the harm caused by the breach.  *Id*. at 363; *see Rainbow Country Rentals & Retail, Inc. v. Ameritech Publ'g, Inc*., 706 N.W.2d 95, 103 (Wis. 2005).  "If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable." *Wassenaar*, 331 N.W.2d at 364 (footnote omitted).  The Wisconsin courts "employ[] the prospective-retrospective approach in determining the reasonableness of the stipulated damages clauses and . . . look[] at the harm anticipated at the time of contract formation and the actual harm at the time of breach (or trial)." *Id*.  The party challenging the bargained-for contractual provision stipulating damages has the burden of proving facts which would justify non-enforcement of the liquidated damages clause.  *Id*. at 361.

After reviewing the particular circumstances of the present case, we conclude that the district court's award of liquidated damages was reasonable. Baymont submitted concrete evidence that its lost royalties over the entire remaining term of the License Agreement would have exceeded $430,000. Actual damages, in the context of the hospitality industry, are difficult to quantify and not strictly monetary; a franchise operation yields not only future royalties, but additional intangibles such as brand recognition and loyalty, and a competitive presence in a geographic region. The full term of Heartland's License Agreement was twenty years. Thus, Baymont conceivably could have had a presence in the Shepherdsville market through 2012, but lost these benefits through Heartland's breach.

The thirty-six-month formula, based on Recurring Fees that actually accrued, was at the time of contracting not an arbitrary calculation, but a "reasonable forecast" of the damages Baymont would sustain in the event of Heartland's breach. *See Wassenaar*, 331 N.W.2d at 363. The formula was based on common business practices and the parties' recent historical performance under the License Agreement, resulting in ascertainable losses in the event of breach. *Id.*

In *Travelodge Hotels*, *Inc. v. Elkins Motel Assocs., Inc*., No. Civ. 03-799 (WHW), 2005 WL 2656676 (D.N.J. Oct. 18, 2005) (unpublished), the United States District Court for the District of New Jersey upheld as reasonable a similar liquidated damages clause in a hotel franchise agreement, taking into account the economic complexities of the market:

> The liquidated damages clause in this case is contained in section 12.1 of the License Agreement, and reads that liquidated damages shall total
>
> > an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 24 full calendar months . . . . Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility.
>
> Section 7 of the Addendum specifically set liquidated damages at "an amount equal to the product of $1,000.00 multiplied by the number of

guest rooms . . . in the Facility."  THI [the plaintiff/franchisor] contends that this represents a negotiated reduction on liquidated damages from the formula set forth in section 12.1 of the License Agreement.

According to THI, the language of the liquidated damages clause "demonstrates the parties' clear intent to choose among the available remedies rather than to set an arbitrary number having no bearing on the contractual relationship."  THI also points out the inherent difficulty of calculating its lost earnings under the License Agreement, as it is dependent upon a percentage of monthly gross room revenues. The room revenues, in turn, are dependent upon the number of bookings in a given month, which can fluctuate drastically from month to month.

[THI] bargained with the [franchisees] to receive income over the period of the License Agreement, and has lost the benefit of its bargain due to the Defendants' breach.  [Defendants] ha[ve] not offered proof of any contractually acceptable excuses to avoid the application of the liquidated damages clause.

2005 WL 2656676, at *11 (internal citation omitted).

Like the franchisee in *Travelodge Hotels, Inc*., Heartland has not proffered "any contractually acceptable excuses" to avoid the liquidated damages award.  *Id*. Heartland's argument favoring a shortened period of loss is based on the fallacy that it terminated the License Agreement on September 25, 2006, and provided the requisite twelve-month advance notice, so as to be excepted from the License Agreement's liquidated damages provision contained in Section 14.c. It did not.  Baymont terminated the License Agreement on March 25, 2005, because Heartland was in noncompliance. Moreover, as the district court observed, the record is devoid of any evidence supporting Heartland's claim that it gave Baymont advance notice of its option not to renew the agreement.  Under the circumstances, the district court's award of $111,325.37 in liquidated damages was eminently reasonable.

V.

Lastly, Heartland argues that the district court's award of treble damages for its Lanham Act violations constitutes an impermissible "penalty" under the statute, which authorizes the trebling of damages for willful trademark infringement, but admonishes

that such an award "shall constitute compensation and not a penalty."   15 U.S.C.
§ 1117(a).[8]

The district court awarded Baymont $117,866.16 in treble damages for Heartland's willful and unauthorized use of Baymont's intellectual property and marks during the holdover period from April 25, 2005 to April 30, 2006.  This award was derived from the parties' agreement that the appropriate measure of damages under the Lanham Act was the royalties, as defined in Section 9.a of the License Agreement,[9] that Baymont would have received from Heartland.[10]  The district court accepted Heartland's computation of royalties, $39, 288.72, a lesser amount than proposed by Baymont, and trebled the sum "inasmuch as it appears clear that the defendants' holdover was willful and unjustified."

We review the district court's award of damages under the Lanham Act for an abuse of discretion.  *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997) ("Section 1117(a) grants a district court a great deal of discretion in fashioning an appropriate remedy in cases of trademark infringement."); *see also Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173 (3d Cir. 2005) ("We [] review the District Court's award of equitable remedies under . . . the Lanham Act under an abuse of

---

[8]15 U.S.C. § 1117(a) states in pertinent part:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction . . . .  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. . . .  Such sum in either of the above circumstances shall constitute compensation and not a penalty.

[9]"Royalty" is defined in the License Agreement as "5% of gross revenues attributable to or payable for rentals of guest rooms and meeting rooms at the Inn (collectively, 'Gross Room Revenues'), including all credit transactions, whether or not collected, but excluding only telephone charges, vending machine receipts, and sales, [and] occupancy and use taxes[.]"

[10]"Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks."  *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) (citation omitted).

discretion standard." (citation omitted)); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1127 (5th Cir. 1991) ("We must respect the fact that [§ 1117(a)] endows the district court with considerable discretion in fashioning an appropriate remedy for infringement" and "acknowledge the trial court's superior capacity to discern the elements of equitable compensation."); *Ramada Inns, Inc.*, 804 F.2d at 1564 ("[T]he Lanham Act . . . expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement." (citation omitted)).

"The general proof and measure of damages in a trademark action is governed by the law of damages of tort actions." *Broan Mfg. Co., Inc. v. Assoc. Distrib., Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991). "Under general tort principles . . . the infringer/tortfeasor is liable for all injuries caused to plaintiff by the wrongful act, whether or not actually anticipated or contemplated by the defendant when it performed the acts of infringement." *Id.* (citation and internal quotation marks omitted). "[D]amages are not permitted which are remote and speculative in nature." *Id.* (citation and internal quotation marks omitted). "[I]n trademark cases courts draw a sharp distinction between proof of the *fact* of damage and proof of the *amount* of damage." *Id.* Thus, "[t]he plaintiff is held to a lower standard of proof in ascertaining the exact amount of damages," and, "'[o]nce the existence of damages has been shown, all that an award . . . requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages.'" *Chain, L.P. v. Tropodyne Corp.*, Nos. 99-6268/6269, 238 F.3d 421, 2000 WL 1888719, at *4 (6th Cir. Dec. 20, 2000) (unpublished table decision) (quoting *Broan Mfg. Co.*, 923 F.2d at 1236).

Certainly, as Heartland argues, the Lanham Act expressly prohibits levying damages that may be classified as a "penalty." *See Taco Cabana Int'l, Inc.*, 932 F.2d at 1127 ("An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive."); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) (holding that § 1117(a) "does not authorize an additional award of punitive damages for willful infringement of a registered trademark. So long as its

purpose is to compensate a plaintiff for its actual injuries – even though the award is designed to deter wrongful conduct – the Lanham Act remains remedial."); *Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 715 (8th Cir. 1980) ("The language of [§ 1117(a)] is clear:  the district court is given broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty."). Generally, "if a sum of money is to be recovered by a third person for violation of a statute instead of a person injured, . . . or *if the sum exacted is greatly disproportionate to the actual loss, . . . it constitutes a penalty rather than damages*." *Bowles v. Farmers Nat'l Bank of Lebanon*, 147 F.2d 425, 428 (6th Cir. 1945) (emphasis added) (internal citations omitted).

Because "the Lanham Act gives little guidance on the equitable principles to be applied by a court in making an award of damages," *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 174 (4th Cir. 2006), the courts have weighed the equities of disputes on a case-by-case basis, considering a wide range of factors including, inter alia, the defendant's intent to deceive, whether sales were diverted, the adequacy of other remedies, any unreasonable delay by the plaintiff in asserting its rights, the public interest in making the misconduct unprofitable, and "palming off," i.e., whether the defendant used its infringement of the plaintiff's mark to sell its own products to the public through misrepresentation. *See id.* at 175-76 (citing *Banjo Buddies, Inc.*, 399 F.3d at 175; *Quick Techs, Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002)). Moreover, "enhancement could, consistent with the 'principles of equity' promoted in [§ 1117(a)], provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." *Taco Cabana Int'l, Inc.*, 932 F.2d at 1127.

In the present case, the record demonstrates that, despite the express language in Section 15 of the License Agreement prohibiting the use of Baymont's marks after termination of the Agreement, and notification to this effect from Baymont in its March 25, 2005, notice of termination, Heartland continued to use and display Baymont's marks in advertising and on its internet page, and even to advertise its new water park,

without paying royalties, until the end of April 2006 – one year after the termination and two months after the district court entered the preliminary injunction ordering it to cease. Thus, there is no question that Heartland acted in deliberate defiance of the License Agreement.

Further, in accepting Heartland's computation of royalties as the basis for the Lanham Act damages award, the district court excluded royalties on Heartland's revenues from movies and pool charges, even though Heartland previously had remitted such royalties to Baymont. Baymont likewise received no royalties on Heartland's income from its new water park or restaurant, even though Heartland admittedly used Baymont's trademarks to advertise these attractions. Because of Heartland's infringement, Baymont lost the ability to control its brand image and reputation and was prevented from operating in the Shepherdsville region – all intangible, but valuable, lost assets.

The fact that Heartland brought suit and challenged Baymont's termination of the License Agreement does not ameliorate its willful, continued use of Baymont's Systems and trademarks after termination of the Agreement. In *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989), the Seventh Circuit found the defendants' argument that they had the right to use the plaintiff's nursing home trademark after termination of the franchise agreement for as long as their action for rescission was pending to be "frivolous":

> No more impressive is the [franchisees'] further argument that they kept on using the trademark because they were duty-bound to return the franchise in the condition in which they had obtained it, trademark and all, *after* their claim for rescission was decided. It was Quality Care's trademark; it was for Quality Care to decide whether to let the [franchisees] continue to use it after the franchise was terminated.

*Id*. at 435. *See also Green River Bottling Co. v. Green River Corp*., 997 F.2d 359, 362 (7th Cir. 1993) ("Unauthorized use of a trademark is an infringement, and we have held that the infringement of a trademark is not a proper self-help remedy for a breach of contract." (citation omitted)).

Moreover, contrary to Heartland's claim, the award of both liquidated damages for breach of contract and treble damages for trademark infringement does not contravene the language of § 1117(a) and necessarily make the statutory damages duplicative or punitive.  The Eleventh Circuit addressed and properly rejected this argument in *Ramada Inns, Inc*.:

> [The franchisees] [] contend that the district court erred in awarding Ramada Inns damages under both the liquidated damages clause of the franchise agreement and under the Lanham Act.  The [franchisees] point out that the purpose of including the liquidated damages in the agreement was to compensate Ramada Inns for lost franchise fees and expenditures to attract a new franchisee for a period of two years after breach of the franchise agreement.  Because some of the trademark infringement award was based upon the same items considered for liquidated damages, the [franchisees] claim that Ramada Inns received a "double recovery for a single injury."
>
> * * *
>
> First, we note that Ramada Inns' observation that damages were awarded for two "sets of wrongs" is as irrefutable as the [franchisees'] contention that the damage awards included common elements.  Liquidated damages were awarded because the partners breached the franchise agreement; trademark infringement damages were awarded because they held over for six months *after* the agreement was terminated.  The franchise agreement stated clearly that upon termination, Ramada Inns was entitled to liquidated damages.  Under the Lanham Act, Ramada Inns was entitled to damages for the [franchisees'] impermissible "holding over."  After all, "holding over" is no different than unlawfully using the Ramada Inns' marks from the beginning of operations.  By committing these two indiscretions, the [franchisees] became liable for two damage awards.  Since damages are not always given to precise calculation, a possibility always exists that some overlap will occur when separate awards are made to compensate for separate wrongs.
>
> Second, were we to hold that the district court erred in awarding trademark infringement damages, we would undoubtedly subvert the purpose behind the Lanham Act.  When a trademark infringement action is established because a franchisee "holds over" as here, and damages are based on the franchisor's losses, royalties normally received by the franchisor and expenditures necessary to establish a new franchise will constitute substantial elements in the damage award.  Were we to hold that trademark infringement damages could not be recovered if the

franchisor received like damages in a separate action for breach of the franchise agreement, we would provide an incentive for some infringers to "hold over." With the knowledge that they could only be answerable for contractual damages, unscrupulous infringers would "hold over" with impunity.

*Ramada Inns, Inc*., 804 F.2d at 1565-67 (internal citations and footnote omitted).

Here, as in *Ramada Inns, Inc*., Baymont's claims for breach of contract and trademark infringement are distinct actions, based on separate conduct and addressing disparate harms. In addition, as we have determined, the liquidated damages award fell short of the $430,000 in lost royalties that Baymont would have received over the remainder of the license term and, consequently, was not tantamount to a double recovery.

Given the abundant evidence that Heartland willfully infringed upon Baymont's trademarks, and that an award of royalties alone was inadequate to compensate Baymont for the true extent of its injuries, we find no abuse of discretion, or prohibited "penalty," in the district court's award of treble damages.

We, along with numerous other courts, have found enhanced damages under § 1117(a) to be appropriate in analogous cases. *See, e.g., U.S. Structures*, *Inc*., 130 F.3d at 1187-88 (affirming the district court's award of treble damages where, after franchise agreement was terminated for lack of payment, the defendants-franchisees admittedly continued to use the franchise trademarks, including participation in a profitable advertising program, while attempting to negotiate a settlement of their dispute); *see also Gorenstein Enter., Inc*., 874 F.2d at 435 (holding that terminated franchisees' continued use of the franchisor's trademark was "so deliberate," and their justifications "so weak," that "it might have been an abuse of discretion for the district judge *not* to have awarded . . . treble damages"); *Taco Cabana Int'l, Inc*., 932 F.2d at 1127 n.20 (affirming doubled damages award under § 1117(a) where "[t]he weight of the evidence persuades us . . . that Two Pesos brazenly copied Taco Cabana's successful trade dress, and proceeded to expand in a manner that foreclosed several lucrative markets within Taco Cabana's

natural zone of expansion"); *Ramada Inns, Inc.*, 804 F.2d at 1566-67 (affirming franchisor's treble damages award where franchisees held over for six months after the agreement was terminated).[11]

We therefore affirm the district court's award of treble damages for trademark infringement to Baymont.

## VI.

For the reasons stated, we affirm the judgment of the district court.

---

[11]*See also New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301-02 (N.D.N.Y. 1996) (awarding treble damages to licensor under § 1117(a) for the former licensee's willful infringing conduct); *KFC Corp. v. Lilleoren*, 821 F. Supp. 1191, 1193 (W.D. Ky. 1993) (awarding treble damages where the franchisee "deliberate[ly] and willful[ly]" "continued to operate under the KFC trademark for a substantial period after notice of termination had been received and even after the action had been instituted"); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1028 (N.D. Tex. 1980), *aff'd sub nom. Holiday Inns, Inc. v. Alberding*, 683 F.2d 931 (5th Cir. 1982) (trebling damages award under § 1117(a) where the franchisees continued to use the franchisor's marks in "flagrant disregard of the rights of Plaintiff"); *cf. Travelodge Hotels, Inc.*, 2005 WL 2656676, at *12 (awarding treble damages to franchisor under 15 U.S.C. § 1117(b) where franchisees "were put on notice on several occasions that they were displaying the Travelodge marks in violation of their termination duties, yet the sign was not removed until over 15 months after termination of the Franchise Agreement"). *But see Ramada Franchise Sys., Inc. v. Boychuk*, 283 F. Supp. 2d 777, 791 (N.D.N.Y. 2003) (finding that hotel franchisor was not entitled to trebling of damages under § 1117(a) absent a showing that the amount awarded as actual damages was inadequate to compensate for trademark infringement and franchisor "offered no non-punitive reasons for the enhancement").