NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0059n.06

Case No. 22-5843

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Feb 08, 2024
KELLY L. STEPHENS, Clerk

THOMAS HOUSE, PhD.; NATIONAL PITCHING ASSOCIATION, INC.,

      Plaintiffs-Appellees,

v.

PLAYER'S DUGOUT, INC.; JOSEPH JOHN NEWTON; JOSEPH ARTHUR NEWTON, JR.,

      Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

OPINION

---

Before: MOORE, GIBBONS, and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. This appeal arises from a jury verdict apportioning liability and awarding damages to both parties. Dr. Thomas House and the National Pitching Association, Inc. (together, "NPA") filed a complaint against Player's Dugout, Inc., its founder and co-owner Joe Newton, and his son and co-owner Joseph Newton (together, "PDI")[1] asserting federal trademark infringement and unfair competition claims under the Lanham Act, as well as state law claims for trademark infringement, unfair competition, breach of contract, and punitive damages. PDI counterclaimed, asserting breach of contract, defamation, federal unfair competition under the Lanham Act, state law unfair competition, tortious interference with prospective business advantage, and seeking compensatory and punitive damages. After an eight-

---

[1] For the purposes of this opinion, we refer to all plaintiffs together (Dr. Thomas House and National Pitching Association, Inc.) as "NPA" and all defendants together (Player's Dugout, Inc., Joe Newton, and Joseph Newton) as "PDI," except where House or the Newtons are referred to separately in an individual capacity.

day trial, the jury returned a mixed verdict, finding for NPA on federal and state law trademark infringement and unfair competition claims, as well as breach of contract and punitive damages, and finding for PDI on defamation, federal law unfair competition, tortious interference with prospective business advantage, and punitive damages. PDI moved for renewed judgment as a matter of law or for a new trial on six grounds, all of which the district court rejected. PDI raises several arguments on appeal stemming from evidentiary objections at trial and the denied post-verdict motion. For the following reasons, we affirm the district court on all grounds except the jury's award of punitive damages against PDI, which we reverse and remand for consideration under the correct standard.

I.

Dr. Thomas House,[2] through his research on biomechanics and experience as a pitching coach, developed an arm care program for baseball players called the Personally Adaptive Joint Threshold Training Program ("PAJTT Program"). The PAJTT Program, as its name suggests, was personalized to each participant, beginning with exercises to build up joint integrity and then, based on the athlete's own velocity in throwing differently weighted balls, writing a personalized weighted-ball program to help the player maximize his own velocity while avoiding injury.

House founded the NPA in 2002 to train and mentor youth athletes.[3] House created and taught NPA certification clinics for baseball coaches, which allowed these coaches to become NPA

---

[2] We refer to Dr. Thomas House simply as "House." We refer to his wife, Marie House, by her full name.

[3] NPA owns a federally registered trademark, U.S. Reg. No. 3,202,667, which was registered on January 23, 2007. The NPA mark is a silhouette of a pitcher with an "overhead swoosh," a stylized trajectory of an arm-throwing movement, for use in clothing, specifically baseball jerseys, pants, and hats.

certified. At these NPA coach certification clinics, House taught a segment of the PAJTT Program, specifically the weighted-ball holds and throws.

In 2003, Joe Newton attended an NPA clinic, where he met House. Newton also met Jamie Evans, a part owner of NPA with whom Newton stayed in touch. In 2010, Evans called Newton about a weighted-ball program that improved throwing velocity while avoiding injury, which Newton then implemented at PDI. Evans wrote the individualized programs, and Newton trained the players based on the programs, which yielded the intended results—the players threw the balls harder and faster. In 2012, Newton used the program to train a minor league pitcher named Stevie Delabar, rocketing Delabar to success. After Delabar's success, PDI began to orient its business toward selling this weighted-ball program, which it called the Velocity Plus Arm Care Program ("Velocity Plus program").

House wrote to Evans and Newton in January 2013 expressing concern that he was not receiving proper consideration or recognition for his "intellectual property," the body of work and research that created the PAJTT Program and Stevie Delabar's success. In February 2014, House and PDI entered into a license agreement. Three provisions of the License Agreement are relevant for this appeal: (1) the license; (2) the royalties; and (3) the piracy provision.

First, the License Agreement granted PDI "world-wide license to use [House's] Know-how and commercial and technical information to use, sell, lease, rent, create participant programs, or otherwise commercialize the PAJTT Program under the name of 'Velocity Plus Arm Care Program' throughout the world." DE 51-1, License Agreement, Page ID 512. Second, PDI was to pay House monthly royalties, specifically $50 for each first-time participant and $40 for returning participants. Third, recognizing the fact that independent third parties had previously sold or marketed the PAJTT Program, House agreed that he would "not knowingly permit any

such third parties to sell or market the PAJTT Program who [did] not have a distributor agreement with" PDI. *Id.* at 514. House would also promptly report to PDI any "known or suspected attempts by third parties to sell or market the PAJTT Program who do not have a contractual arrangement with" PDI and "shall further serve on such third parties that they are not authorized to sell or market the PAJTT Program." *Id.*

Shortly after signing the License Agreement, PDI began advertising its association with NPA and House on its website. The PDI website's new front page featured a photo of Stevie Delabar holding five baseballs, one of which bore the NPA trademark of the pitcher silhouette with the overhead swoosh. The top of the page displayed the phrase "Powered by Tom House" followed by the NPA trademark.



The website displayed the photo and accompanying phrase from 2014 to July 2017. The website's front page also displayed a photo of Newton and House together, above a statement reading "Learn more about the people and research behind the Velocity Plus Arm Care Program." CA6 R. 22, App., at 37 (Pls.' Trial Ex. 47).



**The Velocity+Arm Care Team**
Learn more about the people and
research behind the Velocity Plus
Arm Care Program.

*Id.* The website's "About" page contained biographical information about House and a list of the members of the NPA advisory board. Marie House, who reviewed the first draft of the new website, testified that PDI made these changes to use House and NPA's names for promotional purposes.

For his part, House also began communicating the new association with PDI. Following the execution of the License Agreement, House sent an email to all coaches in the NPA network, notifying them that all health and performance programs would be managed by Newton and PDI. As a result of this email, more coaches began signing up for the Velocity Plus program. Indeed, House was adamant when he instructed NPA coaches that, if they wanted to purchase the Velocity Plus program, they had to go through PDI. House also directed NPA coaches to promote the Velocity Plus program on behalf of PDI.

House and Newton also promoted the Velocity Plus program together. In January 2015, Newton, House, and Delabar spoke at an American Baseball Coaches Association conference, attended by approximately 5,000 high school baseball coaches, about the Velocity Plus program.

And Newton and House attended various other conferences together at which Newton presented the Velocity Plus program. Newton also certified coaches in the Velocity Plus program at NPA's certification clinics at the University of Southern California.

But within a few years, the parties' relationship had soured. PDI believed that House had breached the License Agreement by failing to stop known attempts to pirate the Velocity Plus program. Throughout 2014 and 2015, Joseph Newton sent Marie House the names and information about suspected pirates but felt that House made no attempt to stop them. For his part, House developed concerns in the spring of 2015 that PDI was not following the proper protocols for the PAJTT program. In fact, House and an NPA employee, Alex Marney, visited PDI's facility in Kentucky to touch base and ensure compliance with the proper protocols. House and NPA believed that PDI was improperly expediting the program, achieving better velocity sooner, but with a risk of injury.

Then, in September 2015, PDI stopped making royalty payments to House. PDI maintained this was due to a disruption in Joseph Newton's personal life; while House, on the other hand, felt that the PDI "guys [were] messing with us." DE 155, Trial Tr., Page ID 2111–12. On October 13, 2015, Gary Adornato, the new president and CEO of NPA, sent a letter requesting PDI to agree to dissolution of the License Agreement and termination of the relationship between PDI and NPA/House.

A little more than a week later, on October 26, 2015, NPA sent an email to all NPA-certified coaches that announced the termination of NPA's relationship with PDI. Specifically, the email contained two notes, one signed by House, the other signed by Adornato. House's note introduced Adornato and asked Adornato to say a few words and provide an update. Adornato introduced himself, and then wrote "effective immediately, NPA has ended its affiliation

with, and endorsement of, Joe Newton and his company," explaining that Newton "was not using all of the protocols that make the program safe and effective, and [we] told him so repeatedly." DE 51-10, 10/26/2015 Email, Page ID 598. Adornato concluded, "as a possible result of his changes and omissions, we have learned that several of his customers have been hurt." *Id.*

Several months later, in February 2016, House officially notified PDI that due to "our many conversations and visits regarding" the Velocity Plus program, as well as the failure to pay royalties since summer 2015, PDI was in breach of the License Agreement. DE 155, Trial Tr., Page ID 2112. On June 29, 2016, House terminated the License Agreement through a letter from his counsel, demanding PDI cease and desist from using both House's and NPA's names. But PDI did not remove the NPA trademarks and references to House on its website. In September 2016, three months after the termination letter, House and NPA sued, alleging the following claims: breach of contract, federal trademark infringement in violation of 15 U.S.C. § 1114(1), federal unfair competition in violation of 15 U.S.C. § 1125(a),[4] Kentucky common law trademark infringement, Kentucky common law unfair competition, and Kentucky common law unjust enrichment. The complaint sought compensatory and punitive damages. PDI and the Newtons counterclaimed, alleging fraud, breach of contract, rescission, disparagement or trade libel, defamation, federal unfair competition under 15 U.S.C. § 1125(a), Kentucky common law unfair competition and deceptive trade practices, tortious interference with contracts, and tortious

---

[4] NPA's Lanham Act claims for trademark infringement and unfair competition stem from PDI's alleged infringement of two trademarks. The first was PDI's use of NPA's trademark on PDI's website and other marketing and promotional materials after PDI received notice to cease and desist use of the mark on October 13, 2015. The second was PDI's use of House's name on its website and in connection with its marketing efforts related to the Velocity Plus program after termination of the License Agreement on June 29, 2016. NPA alleged that House's name, which was not registered with the U.S. Patent and Trademark Office, had acquired a secondary meaning that entitled use of the name to Lanham Act protection.

interference with prospective business advantage. Well into discovery, on or around September 7, 2017, and pursuant to an agreed order in district court, PDI removed the NPA trademarks and references to House on its website.

The dispute proceeded to an eight-day jury trial. The first issue that arose, relevant to this appeal, was NPA's damages computation as required by Federal Rule of Civil Procedure 26(a)(1)(A)(iii). The record reveals the following sequence of events. A few months before trial, NPA requested that PDI supplement discovery with additional financial documents relating to PDI's revenues and profits/losses for August 2015 through at least December 2017, which NPA alleged to be the infringing period. *See* DE 179-1, NPA Ex. A, Page ID 3513–15 (specifying that the information was "necessary to the calculation" of NPA's damages, which "cannot be fully ascertained" without it). But the parties disputed whether NPA actually received this requested discovery from PDI. PDI claimed that it sent the discovery, pointing to NPA's list of trial exhibits, which listed "Documents produced as requested by Plaintiffs in supplementation letter dated July 27, 2021" as Plaintiffs' Exhibit 77. DE 109, Pls.' Trial Ex. List, Page ID 1181. NPA maintained that it never received the requested discovery.

Regardless, the evening before NPA was to present its damages evidence, NPA's counsel emailed PDI's counsel with its proposed damages calculation. Using the number of new and returning customers reflected in PDI's royalty reports from November 2015 to July 2017, NPA calculated PDI's gross revenues from sales of the Velocity Plus program by multiplying the number of new and returning customers with the amounts that it knew PDI charged them ($455 and $295, respectively). Using those numbers, NPA calculated PDI's gross revenues from sales of the Velocity Plus program as $337,195 for use of the NPA trademark from November 2015 through July 2017, and $141,715 for use of House's name from July 2016 through July 2017. The

next day, at trial, NPA introduced this evidence via the testimony of Marie House. PDI objected to the testimony as "surprise evidence," but the court deferred ruling on the objection and permitted Marie House's damages testimony. DE 161, Trial Tr., Page ID 2550, 2556, 2604, 2612–15, 2618-19.

PDI then introduced an expert witness, Andrew Chambers, who presented evidence concerning PDI's net profits within the context of PDI's defamation claim against NPA. Calculating based on PDI's tax returns, Chambers concluded that PDI's net profit during the infringing period was 8.4 percent. PDI also showed at trial via its tax return that in 2017, the last year of its alleged infringement, PDI operated at a net loss of $32,307.

The next issue relevant to this appeal was PDI's argument that House breached the License Agreement first, and thus PDI was entitled to judgment as a matter of law on its breach of contract claim. At trial, the district court rejected PDI's oral Rule 50(a) motion for judgment as a matter of law. The court noted that there was "sufficient evidence in the record that reasonable minds could differ on whether Dr. House knowingly permitted any third party to sell or market the PAJTT program," and that the question of whether House breached the contract first should "necessarily [] go to the jury." DE 162, Trial Tr., Page ID 2827, 2829.

The district court also fielded arguments about the jury instructions. The court rejected two of PDI's proposed jury instructions as to slander. First, the court rejected PDI's proposed instruction that the jury consider whether House ratified NPA's alleged defamatory statement in the October 26, 2015, email that the Velocity Plus program was hurting PDI's customers. The court did not view the ratification case law as dispositive because House was an owner, not employee, of NPA, and there was no case law establishing that an owner's silence was ratification of alleged defamation. Second, the district court rejected PDI's proposed instruction that the jury

consider whether House committed slander per se by stating to Bill Schopp, an NPA-certified coach, on October 10, 2015, that Velocity Plus was "hurting a lot of arms." DE 169-1, Schopp Dep., Page ID 3148, 3153; DE 162, Trial Tr., Page ID 2943–44. The district court reasoned that Schopp, the only person who heard the alleged defamatory statement, testified that he did not change his opinion of Velocity Plus and PDI, so there was no effect from the alleged defamation.

The jury returned a mixed verdict. The jury found in favor of House on the breach of contract claim and awarded $40,386.20 in damages. The jury also found in favor of House and NPA on the trademark infringement and unfair competition claims under the Lanham Act, awarding $1 in actual damages and $340,000 based on PDI's profits during the infringing period.[5] The jury also found in favor of House and NPA on unfair competition under Kentucky law and awarded $2 in compensatory damages. The jury determined that PDI owed punitive damages of $67,649.82 under Kentucky law. Finally, the jury found in favor of NPA on PDI's claim of defamation per se, and the court dismissed that claim. On the other hand, the jury found in favor of PDI on defamation per quod and awarded $100,000 in compensatory damages. The jury also found in favor of PDI on unfair competition under federal law, tortious interference with prospective business advantage under Kentucky state law, and punitive damages under Kentucky state law, awarding $100,000 in total for these three claims.

PDI moved for renewed judgment as a matter of law or for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59. Relevant for this appeal, PDI argued that (1) the district

---

[5] Although it is not clear from the record, it seems the jury reached this $340,000 number by rounding up from Marie House's testimony that the gross revenues from sales of the Velocity Plus program for November 2015 to July 2017 was $337,195. Presumably, the jury disregarded Marie House's second calculation of the gross revenues from sales of the Velocity Plus program from July 2016 through July 2017 (which was $141,175) as duplicative, and so did not add it to the $340,000 awarded.

court improperly admitted NPA's damages evidence for its Lanham Act claims; (2) the jury's

Lanham Act damages award of $340,000 was excessive and against the weight of the evidence;

(3) the court should have instructed the jury on the issue of House's ratification of NPA's

defamation, so the jury could have found House personally liable for defamation; (4) the jury's

verdict on defamation per se was against the weight of the evidence; and (5) the jury's award of

punitive damages against PDI was unconstitutionally excessive.  The district court denied the

motion in its entirety.

III.

On appeal, PDI raises several arguments:

1) the jury's award of $340,000 in profits under the Lanham Act was excessive because the damages were not attributable to the use of NPA's trademark and House's name;

2) the district court abused its discretion by refusing to adjust the excessive profits award;

3) the district court abused its discretion by admitting Marie House's testimony on PDI's royalty reports under Federal Rule of Civil Procedure 37(c)(1);

4) the district court's omission of the "clear and convincing" standard in the jury's Kentucky state law punitive damages award requires reversal;

5) PDI is entitled to judgment as a matter of law on its claim for breach of contract;

6) the jury should have been given an instruction permitting them to hold House personally liable for defamation via ratification; and

7) the jury should have been given an instruction permitting them to hold House liable for slander per se.

A.

PDI advances several related arguments as to why the jury's award of $340,000 in profits

under the Lanham Act was excessive.  PDI first argues that profits awarded under the Lanham Act

must be attributable to the use of the plaintiff's mark, and NPA did not put forward any evidence

as to why the royalty reports on which Marie House testified were attributable to its trademarks. PDI then argues that the district court had an equitable duty under the Lanham Act to reduce the excessive damages award, and the district court abused its discretion by failing to reduce that award. Finally, PDI argues that the inflated profits award against it resulted from improper surprise testimony, and the district court abused its discretion by allowing Marie House to testify about the total Velocity Plus sales and by allowing NPA to argue in its closing argument that it sought 100% of the gross revenues of the Velocity Plus sales. For the following reasons, we affirm the district court on each of these three claims.

i.

Before assessing the merits of the argument that the jury's Lanham Act award was excessive, we address a preliminary matter—whether PDI has forfeited this argument by failing to preserve it for appellate review. NPA argues that, prior to this appeal, PDI failed to claim that the evidence was insufficient to show a *causal nexus* between its revenues and the infringing activity. NPA acknowledges that PDI, in its post-verdict motion, argued that the jury failed to consider PDI's costs and expenses, that the jury should have deducted those costs and expenses from the profits award, and thus that this verdict was against the weight of the evidence. But NPA asserts that this previous focus on whether the jury failed to properly deduct costs and expenses is different from the argument that PDI now raises, which is that the damages based on Velocity Plus royalty reports are *not attributable to the use of the marks*. In other words, PDI focused previously on "costs and deductions" and did not raise this "causal nexus" issue before appeal. CA6 R. 25, Appellee Br., at 11–12.

As a general rule, we will not consider arguments raised for the first time on appeal. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir. 1994). But on appeal, "parties are not

limited to the precise arguments they made below." *Ohio Adjutant Gen.'s Dep't v. Fed. Lab. Rels. Auth.*, 21 F.4th 401, 406 (6th Cir. 2021) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995)). This court has acknowledged that "[i]t would be unreasonable, and in some ways would defeat the purpose of appellate litigation, to require [parties] to raise the exact same arguments that they raised earlier." *Id.* To preserve an issue for appellate review, a litigant need only "'state the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue' and provide 'some minimal level of argumentation in support of it' before the district court." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 383 (6th Cir. 2023) (quoting *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009)). Where a litigant "'unequivocally identifies its theory at a district-court hearing and provides argumentation in support of it,' that party 'has not forfeited it on appeal.'" *Id.* at 384 (quoting *Bard v. Brown County*, 970 F.3d 738, 749 (6th Cir. 2020)) (alterations omitted).

This is not a case where the argument on appeal has never been raised before. Here, PDI unequivocally identified its theory (that NPA had failed to prove that 100% of the revenues from the Velocity Plus program were attributable to the use of NPA's marks) at several points in the district court litigation and provided at least "some minimal level of argumentation in support of it." *See id.* at 383–84. First, in the oral Rule 50(a) directed-verdict motion, PDI asserted that proof of causation is required to establish profits-based Lanham Act awards, or "[h]ow much of the business is attributable to the use of the trademark," and that NPA had given them "nothing" on that. DE 161, Trial Tr., Page ID 2786. In other words, there was no pure profits evidence to go to the jury. Similarly, in the argumentation over jury instructions, PDI asserted that the correct instruction on the Lanham Act would be "profits attributable to the infringement of the marks," not "profits derived from the sale of the program" more generally. DE 166, Trial Tr., Page ID

2995–96. And in PDI's post-trial Rule 50(b) and Rule 59 motion, it asserted that "[e]ven when a plaintiff is entitled to a profits award, they should rightly recover only net profits attributable to an alleged infringement." DE 170-1, PDI JNOV Mot., Page ID 3208.

While this argument was not the main thrust of PDI's post-verdict motion, PDI did raise it and offer at least a minimal amount of argument in support of it. *See Stryker Emp.*, 60 F.4th at 383–84. It would be unreasonable to require PDI's argument here to be an exact clone of its post-verdict motion, especially when the overall theory argued—that the Lanham Act profits award was excessive—is the same. *See Ohio Adjutant Gen.'s Dep't*, 21 F.4th at 406. PDI thus did not forfeit its argument that the profits awarded are not attributable to the use of NPA's marks.[6]

Proceeding to the merits, we first determine the standard of review. Although PDI's post-verdict motion was both for renewed judgment as a matter of law and a new trial, PDI's requested relief was a new trial under Rule 59(a). The district court denied this motion for a new trial. We review a district court's denial of a motion for a new trial under Rule 59(a) for abuse of discretion. *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 798–99 (6th Cir. 2018). A district court abuses its discretion when it "relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* at 799 (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556,

---

[6] Relatedly, NPA argues that PDI on appeal is making a sufficiency-of-the-evidence argument that is also forfeited. NPA argues that PDI failed to preserve its nexus argument in its pre-verdict motion for JMOL and flags this circuit's caution that "motions for a new trial should not be used as a loophole for presenting sufficiency arguments that were not properly preserved by a pre-verdict motion for JMOL." CA6 R. 25, Appellee Br., at 12 (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 509 (6th Cir. 2016)). But as discussed above, PDI raised the nexus argument in its oral Rule 50(a) directed verdict motion. PDI thus did not fail to preserve this argument at either the 50(a) or 50(b) stage.

560 (6th Cir. 2013)); *see also Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019) (quoting *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998)).

A successful plaintiff under the Lanham Act "shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  The Act adopts a burden-shifting approach to proving a defendant's profits: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  *Id.*  The text places a "modest burden" on the plaintiff to prove the defendant's "sales" from the trademark, then flips the burden to the defendant to identify any deductions from this number.  *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 471 (6th Cir. 2022).  Both the statute and controlling case law make clear that the burden of apportioning the profits is on the defendant.  *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 605–06 (6th Cir. 1991); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942) ("The burden is the infringer's to prove that his infringement has no cash value in sales made by him. . . .  There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark.  But to hold otherwise would give the windfall to the wrongdoer.").  This court "assume[s] that the defendant's profits equal his gross sales unless he presents evidence of his costs."  *Taylor v. Thomas*, 624 F. App'x 322, 328 (6th Cir. 2015).

PDI is correct that, as an initial matter, "a plaintiff likely must show some connection between the identified 'sales' and the alleged infringement."  *Max Rack*, 40 F.4th at 472.  *Max Rack* noted it was "dubious to claim that [a plaintiff] could satisfy its initial burden merely by introducing [a defendant's] total companywide sales data and thereby shift to [the defendant] the burden to disprove that its infringement affected every dollar of revenue."  *Id.*  But NPA has carried

its "modest burden" here. *See id.* at 471. NPA put forward PDI's gross revenues generated from sales of the Velocity Plus program during the alleged infringing period. During that period, PDI used the NPA mark and House's name and experience to promote the Velocity Plus program by displaying the NPA mark and House's photo and information on its website. The sale of all Velocity Plus programs thus bears a connection with the alleged infringement. Moreover, each sale of the Velocity Plus program included a kit containing various weighted balls, each of which bore the NPA trademark.

Here, NPA has shown that there is "some connection" between the sales of the Velocity Plus program and the use of its marks. *See Max Rack*, 40 F.4th at 472. Indeed, the sale of any product "bearing the infringing mark" establishes a sufficient connection between the infringement and the sale. *Id.* (quoting *Wynn*, 943 F.2d at 606). NPA has thus carried its "modest burden," *id.* at 471, and the burden properly shifted to PDI to prove its costs and deductions claimed. The district court did not abuse its discretion in concluding that Marie House's testimony on PDI's royalty reports and PDI's alternative calculation presented by its expert witness were sufficient to support the jury's verdict. We affirm the district court's denial of PDI's Rule 59(a) motion for a new trial on this claim.

ii.

Awards under the Lanham Act must "constitute compensation and not a penalty." 15 U.S.C. § 1117(a). PDI argues that the jury's profits award was an impermissible penalty, and the district court committed an error of law by failing to reduce that award.

"We review the district court's award of damages under the Lanham Act for an abuse of discretion." *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 342 (6th Cir. 2010); *see also Taylor*, 624 F. App'x at 328. To be sure, the Lanham Act does prohibit levying damages that

could be classified as a "penalty." *La Quinta*, 603 F.3d at 342 (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991)). A penalty, as opposed to properly calculated damages, is typically an award that is "greatly disproportionate to the actual loss" or a sum of money that is recovered by someone other than an injured person. *Id.* at 343 (quoting *Bowles v. Farmers Nat'l Bank of Lebanon*, 147 F.2d 425, 428 (6th Cir. 1945)). But this court has rejected arguments that an award of profits damages under the Lanham Act must exactly match plaintiff's injuries or represent a 1:1 ratio to defendant's profits. *See La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 612–13 (6th Cir. 2023) (rejecting the argument that an award of profits becomes a penalty unless that award is designed solely to compensate the plaintiff for actual injuries); *Taylor*, 624 F. App'x at 328 ("We assume that the defendant's profits equal his gross sales unless he presents evidence of his costs."). Various theories, including unjust enrichment, deterrence, and compensation can support—and have supported—an award of profits under the Lanham Act. *La Bamba*, 75 F.4th at 613.

NPA's burden under the statute was to present evidence of PDI's sales. *See* 15 U.S.C. § 1117(a). NPA carried that "modest burden." *See Max Rack*, 40 F.4th at 471. NPA presented evidence, via the testimony of Marie House, that PDI's gross revenues, which PDI generated from selling the Velocity Plus program during the alleged period of infringing use of the NPA trademark (November 2015 to July 2017), were around $337,195, and the gross revenues during the alleged period of infringing use of Dr. House's name (July 2016 to July 2017) were around $141,700. The burden then shifted to PDI to present evidence of cost or deduction claimed. *See* 15 U.S.C. § 1117(a).

Although PDI claims that it was surprised by NPA's decision to seek an award of profits, PDI nonetheless presented evidence concerning its profits, albeit in the context of its defamation

claim against NPA. Through its expert witness on defamation-based damages, Andrew Chambers, PDI presented evidence of PDI's net profits that the jury could have viewed as probative concerning PDI's costs during the infringing period. *See* DE 161, Trial Tr., Page ID 2684–701 (concluding based on PDI's tax returns that PDI's net profit during the infringing period was 8.4 percent); DE 42-1, Chambers Expert Rep., Page ID 343. Although Chambers was PDI's defamation expert and did not opine on the Lanham Act issue, his testimony was nevertheless an adequate alternative measure of profits for purposes of the Lanham Act profits award. There was thus no surprise to PDI, as PDI was on notice that NPA was seeking its profits (given the complaint and various discovery requests, discussed in Section III.A.iii, *infra*), and Chambers's testimony offered at least a viable alternative calculation of its profits, even if for a different issue. PDI also showed at trial via its tax return that in 2017, the last year of its infringement, PDI operated at a net loss of $32,307. Given the evidence presented, the jury's award of $340,000 corresponds to its ultimate conclusion that NPA's evidence on profits was largely more credible than PDI's.[7]

PDI asks us to follow the lead of the District Court for the District of Columbia in *Breaking the Chain Foundation, Inc. v. Capitol Education Support, Inc.*, in which the court declined plaintiff's request to award defendant's gross revenues and instead awarded only defendant's profits. 625 F. Supp. 2d 1, 3 (D.D.C. 2009). First, this case is non-precedential in our circuit. Second, the procedural posture—a judge independently evaluating the damages in the context of default judgment—vitiates the case's instructive value. *Breaking the Chain* dealt with default judgment, and binding case law requires judges in that context to make an "independent determination of the sum to be awarded." *Id.* at 2 (quoting *Int'l Painters & Allied Trades Indus.*

---

[7] Presumably, the jury awarded $340,000, instead of $478,895, to avoid double-counting PDI's revenues during the infringing period.

*Pension Fund v. R.W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)). The judge in *Breaking the Chain* was thus the factfinder. *See id.* at 2–3. Here, the jury was the factfinder. The jury heard NPA's evidence of PDI's sales and PDI's evidence of its costs, compared both, and came to a conclusion. More in line with our situation here, the court in *Max Rack* refused to overturn the jury's award, even when on its face there did not appear to be a 1:1 ratio between profits and the jury award, instead suggesting that the jury considered an alternative infringement theory and found Max Rack's evidence more persuasive. *See Max Rack*, 40 F.4th at 472–73 (upholding a jury's award of $250,000 after the defendant's evidence of $188,787 in profits). Here, we follow *Max Rack* and find no abuse of discretion in the district court's refusal to overturn the jury's award.

iii.

PDI argues that the inflated Lanham Act profits award resulted from improper surprise testimony, and the district court abused its discretion by allowing Marie House to testify about the total Velocity Plus sales and by allowing NPA to argue in its closing argument that it was seeking 100% of the gross revenues of the Velocity Plus sales.

We review a district court's decision not to exclude evidence as a sanction under Rule 37(c)(1) for abuse of discretion. *Bisig*, 940 F.3d at 218; *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015). To find abuse of discretion, the district court's action must leave us with a "definite and firm conviction" that the district court "committed a clear error of judgment." *Bisig*, 940 F.3d at 218 (quoting *Stough*, 138 F.3d at 614). "Even though another court might have struck a different balance," we will not reverse unless the district court relied on erroneous findings of fact or applied an incorrect legal standard. *See EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459, 470 (6th Cir. 2019).

Under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), a party must provide "a computation of each category of damages claimed" and must also make available "the documents or other evidentiary material . . . on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 26(e) imposes an ongoing duty on parties to supplement disclosures. Fed. R. Civ. P. 26(e). If a party fails to provide information required under Rule 26(a) or (e), that party may not use that information at trial unless the failure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether a party's omitted or late disclosure is "substantially justified" or "harmless," this circuit considers five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe*, 801 F.3d at 747–48 (citations omitted).

The district court here concluded that NPA sought an award of profits but did not disclose a calculation for such damages as it should have under Rule 26(a). The district court then applied the five *Howe* factors and found that NPA's failure to disclose was harmless or substantially justified under Rule 37(c)(1). The district court did not rely on a clearly erroneous finding of fact, misapply the law, or use an erroneous legal standard, and so did not abuse its discretion.

First, the district court held that PDI was not surprised. We agree. PDI was aware that NPA was seeking profits under the Lanham Act as soon as PDI received NPA's complaint. *See* DE 39, First Am. Compl., Page ID 244 ("NPA is entitled to a judgment against PDI for . . . PDI's profits . . . arising from PDI's wrongful conduct, in an amount to be proven at trial."). And NPA appears to have made efforts to calculate that precise number. A few months before trial, NPA requested that PDI supplement discovery with additional financial documents relating to PDI's revenues and profits/losses for the infringing period. NPA specified the information was

"necessary to the calculation" of NPA's damages, which "cannot be fully ascertained" without this information.  DE 179-1, NPA Ex. A, Page ID 3513–14.  But PDI allegedly never sent NPA this information.

Without the requested documents, NPA calculated a profits figure at trial using PDI's royalty reports, multiplying the number of new and returning customers to the Velocity Plus program by the rates PDI charged.  It is true that NPA emailed this calculation to PDI mid-trial, specifically the evening before Marie House's testimony on the royalty reports.  But the district court did not abuse its discretion in concluding that the calculation should not reasonably have come as a surprise to PDI.  NPA used relevant documents that PDI already possessed and used basic math to calculate the gross revenues for the sales of the Velocity Plus program during the infringing period.  *See Howe*, 801 F.3d at 748 (finding no surprise when the defendant had all of the information relevant to the computation of damages in its own possession and where damages were calculated by "simple math").

PDI makes two arguments in rebuttal.  As an initial matter, PDI asserts that "profits *do not equal revenues*," and NPA's failure to provide a profit calculation in advance made it impossible to cross-examine Marie House about how her *sales* calculations related to NPA's *profits* claim.  CA6 R. 21, Appellant Br., at 38–39.  This argument ignores the fact that, under the text of the Lanham Act, it was NPA's burden to put on evidence of sales, and PDI's burden to put on evidence of cost or deduction claimed.  *See* 15 U.S.C. § 1117(a).  And as discussed above, the evidence that NPA presented bears a sufficient relationship to the use of the trademarks.  *See* Section III.A.i., *supra*.

PDI additionally argues that because the Lanham Act allows plaintiffs to recover only profits *attributable* to the alleged infringement, and because PDI was unaware until the closing

argument that NPA intended to characterize 100% of PDI's Velocity Plus sales as being attributable to the infringement, PDI was unable to muster expert or other evidence countering that overbroad assertion. But, again, the statutory requirement on defendants to prove "all elements of cost or deduction claimed" should have put PDI on notice that it needed to present evidence of its costs. *See* 15 U.S.C. § 1117(a). And PDI did—PDI presented expert testimony showing its net profit during the infringing period was 8.4% and that it steadily lost money during the infringing period, eventually operating at a loss. At closing argument, PDI explained to the jury that, based on the tax returns PDI had presented, PDI had made $23,757 in profits in 2016 and lost $32,000 in 2017, meaning the damages in the case were "for a negative amount of money." DE 166, Trial Tr., Page ID 3088–89. PDI thus explicitly contended that NPA was not entitled to any award under the Lanham Act because PDI had lost money during the infringing period, as demonstrated by its tax returns. This demonstrates that PDI recognized that showing its costs and deductions was relevant to offsetting any possible profits award under the Lanham Act.

Second, the district court concluded that PDI had an opportunity to remedy any surprise, considering (1) basic math is appropriate for lay testimony and does not require expert testimony; (2) PDI did have an expert witness at trial, Andrew Chambers, who testified after Marie House to an alternative calculation of PDI's profits; and (3) PDI waived any argument regarding opportunity to cure by not requesting such an opportunity at trial to recess to allow review of the calculations. On appeal, PDI argues that it retained Chambers to testify on defamation damages only. But rebutting Marie House's simple mathematical calculations would not necessarily have required expert testimony. *See United States v. Madison*, 226 F. App'x 535, 544 (6th Cir. 2007) (noting that basic arithmetic is within the capacity of any reasonable lay person). Moreover, PDI had the opportunity to cross-examine—and did cross-examine—Marie House. And Chambers testified

after Marie House as to PDI's losses during the infringing period. The district court thus did not abuse its discretion in finding that PDI had adequate opportunity to remedy any surprise.

Third, the district court concluded that NPA's damages evidence was not overly disruptive, as NPA used PDI's own documents, PDI had the opportunity to cross examine Marie House, and PDI had the opportunity to present (and did present) a witness relevant to the question of PDI's profits. For the same reasons as discussed in the first two points above, the district court did not abuse its discretion in finding no disruption.

Fourth, the district court examined the importance of the evidence and deemed this factor neutral, as the evidence was both important to NPA's case and prejudicial to PDI's. On appeal, PDI asserts that the introduction of a "legally invalid measure of damages" cannot have been important to NPA's case. CA6 R. 28, Appellant Reply Br., at 14. Because, as discussed above, the evidence was not a "legally invalid measure of damages," the district court did not abuse its discretion when it found this factor was neutral.

Finally, the district court found NPA had a valid explanation for its failure to disclose. PDI was the party who at all times had "possession, custody, or control" of the royalty documents, and thus NPA had no duty to disclose such documents, because they were already in PDI's possession. DE 184, Mem. Op. & Order, Page ID 3644–45 (quoting Fed. R. Civ. P. 26(a)(1)(A)(ii)). Further, the district court noted that PDI's complaint of NPA's last-minute damages disclosure ignored the "co-dependent nature" of the calculation of NPA's damages. *Id.* at 3645 (quoting *G & J Gears Austl. Pty., Ltd. v. Rockcrusher USA LLC*, No. 4:06 CV 2314, 2009 WL 10688912, at \*3 (N.D. Ohio Feb. 13, 2009)). On appeal, PDI argues that the district court made a mistake of fact, as it assumed the reason for NPA's failure to disclose was PDI's own delay. PDI asserts that it immediately complied with NPA's July 2021 request for additional documents, as evidenced by

NPA's list of trial exhibits, which listed "Documents produced as requested by Plaintiffs in supplementation letter dated July 27, 2021" as Plaintiffs' Trial Exhibit 77. *See* DE 109, Pls.' Trial Ex. List, Page ID 1181. But NPA asserts on appeal that it never received the specific monthly revenues information through 2017 as necessary to the calculation of NPA's damages. As this factual matter remains unresolved, the trial court did not make a "clearly erroneous finding[] of fact" that would constitute an abuse of discretion. *Bisig*, 940 F.3d at 218 (quoting *Stough*, 138 F.3d at 614)). More critically, the district court did not abuse its discretion in concluding that because PDI at all times should have had possession of its own royalty reports, just as it had possession of its own tax returns, it could not have been harmed by NPA's failure to disclose.

In sum, we conclude that the district court did not abuse its discretion by allowing Marie House to testify about the total Velocity Plus sales and by allowing NPA to argue in its closing argument that it was seeking 100% of the gross revenues of the Velocity Plus sales.

B.

PDI next argues that this court should reverse the jury's punitive damages award for NPA's state law unfair competition claim. PDI asserts that the jury instructions for the punitive damages award against it were "fatally flawed" because they used the incorrect standard: The jury instructions used the incorrect "preponderance of the evidence" standard instead of the correct "clear and convincing" standard.

To begin, it is undisputed that the jury instructions used the incorrect standard. Kentucky law permits recovery of punitive damages "only upon proving, by clear and convincing evidence," that the defendant "acted toward the plaintiff with oppression, fraud or malice." KY. REV. STAT. ANN. § 411.184(2). The jury instructions said that such damages could be awarded if the conduct warranting damages was established by a preponderance of the evidence. The jury awarded

$67,649.82 in punitive damages, and the district court entered judgment against PDI. But PDI failed to make a contemporaneous objection at trial or in its post-verdict motion.

This leads to the question of whether federal or state law applies to review incorrect instructions where, as here, the party appealing the instructions did not object at trial. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); CA6 R. 21, Appellants' Br., at 43 (admitting that no contemporaneous objection was made). We conclude that federal law applies. In 2003, the Federal Rules of Civil Procedure were amended to add Rule 51(d)(2), which states that where "a plain error" in jury instructions "has not been preserved as required" through an objection, the error may be reviewed only if it "affects substantial rights." Fed. R. Civ. P. 51(d)(2). Where a federal rule of procedure consistent with the Rules Enabling Act is applicable, "the Federal Rule applies regardless of contrary state law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 n.7 (1996). As a result, federal law—rather than Kentucky law—applies to review this incorrect instruction, and the Kentucky law on this issue cited by PDI is not relevant to our review.

Applying federal law, we have said—both before and after Rule 51(d)(2)'s adoption—that where a plain error in jury instructions is so "obvious and prejudicial" that we are required to act "in the interests of justice," we may reverse even where the complaining party fails to object at trial. *See, e.g.*, *Young v. Langley*, 793 F.2d 792, 795 (6th Cir. 1986); *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1075–76 (6th Cir. 2015); *Armstrong v. Shirvell*, 596 F. App'x 433, 451 (6th Cir. 2015). Here, PDI has shown a "[d]eviation from a legal rule," that is "obvious," considering the text of the Kentucky statute unequivocally establishes a "clear and convincing" standard. *See Barnett v. Smithwick*, 835 F. App'x 31, 34 (6th Cir. 2020) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (alteration in original); *cf. id.* at 34–35 (finding that an error is not "obvious" where no authority definitively answered whether the plaintiff's proposed

instruction applied to her specific facts); *Scott v. Miller*, 361 F. App'x 650, 654 (6th Cir. 2010) (finding that a legal error is not obvious where it is subject to reasonable dispute). PDI has also shown that this erroneous charge impacted its substantial rights, as the jury's verdict on punitive damages is directly "related to the challenged instruction," and it is more probable than not that, had the jury instructions reflected the correct legal standard, the jury's verdict would have been different.[8] *See Alsobrook v. UPS Ground Freight, Inc.*, 352 F. App'x 1, 3 (6th Cir. 2009) (finding that the erroneous instruction did not affect appellants' substantial rights because there was no "clear indication that the jury's verdict was related to the challenged instruction"); *Reynolds v. Green*, 184 F.3d 589, 595 (6th Cir. 1999). We reverse and remand the jury's punitive damages award against PDI for consideration under the proper "clear and convincing" standard. Because we reverse the jury's punitive damages award against PDI, we need not consider PDI's argument that the award is unconstitutionally excessive under the Due Process Clause of the Fifth Amendment.

## C.

The next issue for our consideration is whether PDI is entitled to judgment as a matter of law on its claim for breach of the License Agreement. PDI asserts that the district court should have granted its mid-trial motion for judgment as a matter of law for breach of the License

---

[8] Nor did PDI "intentionally acquiesce to the error." *See Barnett*, 835 F. App'x at 34 (stating that to show plain error, appellant must show that she did not intentionally acquiesce to the error); *Scott*, 361 F. App'x at 654; *see also New Breed Logistics*, 783 F.3d at 1075. True, the parties used the incorrect legal standard in some places in their jointly proposed jury instructions. *See* DE 116, Proposed Jury Instructions, Page ID 1231, 1239, 1245, 1255, 1279. But the parties used the correct "clear and convincing evidence" standard in the instruction concerning punitive damages against PDI. *See id.* at 1303. The district court then adopted the incorrect "preponderance of the evidence" framework regarding punitive damages awarded against PDI but not NPA. DE 141, Jury Instructions, Page ID 1471, 1484. Given both parties and the court at some point quoted the incorrect standard, thus generating confusion about the correct standard, PDI did not "intentionally acquiesce" to the error.

Agreement because there was no genuine dispute of material fact that House breached the License Agreement first. NPA responds that first, PDI failed to preserve this argument that House breached the License Agreement first because PDI did not raise it in its post-verdict motion for judgment as a matter of law or new trial. Second, even if PDI had properly preserved the argument, the argument fails on the merits. In a supplemental letter, PDI argues that the Supreme Court in *Dupree v. Younger*, 598 U.S. 729 (2023), held that purely legal arguments made in a motion for summary judgment need not be renewed in a post-trial motion to be preserved for appeal.

As an initial matter, NPA is correct that PDI did not renew its breach of contract claim in its post-verdict motion for judgment as a matter of law or new trial. The breach of contract claim is not one of PDI's six grounds for renewed judgment as a matter of law or new trial. Nor was it discussed or argued within the context of any of the six grounds. This is unlike PDI's claim that its profits were not attributable to its infringement, which PDI did raise in its renewed motion for judgment as a matter of law or new trial. *See* Section III.A.i., *supra*. There is no "minimal level of argumentation" on the breach of contract claim in the motion. *See Stryker Emp.*, 60 F.4th at 383 (quoting *Huntington Nat'l Bank*, 574 F.3d at 332).

NPA is thus correct that PDI has failed to preserve its claim for appeal. "[T]he precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment as a matter of law—cannot be appealed unless that motion is renewed pursuant to Rule 50(b)." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006). In the context of a jury trial, the Federal Rules of Civil Procedure require parties "to speak up at two times if they want the court to resolve the claim as a matter of law." *Maxwell v. Dodd*, 662 F.3d 418, 420–21 (6th Cir. 2011). First, a party must move for judgment as a matter of law before the claim goes to the jury. *Id.* at 421. Then that party must renew the motion, or seek a new trial, after the jury issues its verdict. *Id.*

Without an essential Rule 50(b) ruling by the district judge who heard the evidence, this court may not consider the claim. *Id.* If a party fails to make a renewed motion for judgment as a matter of law after a jury verdict, this court is "'powerless' to review the sufficiency of the evidence after trial." *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 779 (6th Cir. 2020) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011)).

PDI claims that its breach of contract claim is "purely legal" and that it may be reviewed pursuant to *Dupree v. Younger*. *Dupree* held that a district court's resolution of a pure question of law, which has an answer "independent of disputed facts" and thus is not superseded by later developments in the litigation, merges into the final judgment and is reviewable on appeal. 598 U.S. at 735, 737. But PDI's claim that House breached the License Agreement first is not purely legal. In fact, it is almost entirely factual.

In *Dupree*, the Supreme Court noted that the courts of appeals will need to develop the line between factual and legal questions. *Id.* at 737–38. Here, the line is clear. The question of whether a breach has occurred is generally a question of fact. *See Hodak v. Madison Cap. Mgmt., LLC*, 348 F. App'x 83, 90 (6th Cir. 2009). As NPA correctly notes, Kentucky's breach of contract legal standards have never been disputed by the parties—the only disputed matter is whether the evidence was sufficient to grant judgment as a matter of law in PDI's favor. The district court's statements upon denying the Rule 50(a) motion for judgment as a matter of law drive this point home: "So based on the various different pieces of information in this case, there is sufficient information to differ on a conclusion of whether Mr. House breached Section 3(c) . . . those are all factual issues that can go to the jury." DE 162, Trial Tr., Page ID 2829. This matter is not purely legal, so *Dupree* cannot preserve the argument. PDI has thus forfeited its argument that House breached the License Agreement first.

D.

PDI asserts two arguments relating to its defamation claims. First, PDI argues that the district court committed legal error by refusing to give PDI's requested ratification instruction. Second, PDI argues that the district court erred by refusing to give an instruction to the jury allowing it to find House personally liable for defamation *per se*.

As discussed above, federal law determines the standard of review for PDI's objection to the jury instructions. *See* Section III.B., *supra*. State law determines the substance of the jury instructions. *See Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000) ("Although trial courts have broad discretion in framing jury instructions, state law determines the substance of jury instructions in a diversity action.").

"This court 'reviews a district court's refusal to give requested jury instructions under an abuse of discretion standard.'" *Id.* (quoting *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000)); *Williams v. Eau Claire Pub. Schs.*, 397 F.3d 441, 445 (6th Cir. 2005). A district court's refusal to give jury instructions is reversible error if: "(1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; [and] (3) the failure to give the instruction impairs the requesting party's theory of the case." *Hisrich*, 226 F.3d at 449 (quoting *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 820 (6th Cir. 1999)). "A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir. 1990)).

i.

The basis of PDI's defamation claim was an October 26, 2015, email from Alex Marney's email address, with two separate notes in the body of the email, both addressed to "NPA Certified

Coaches." DE 51-10, 10/26/2015 Email, Page ID 597–98. One of the notes was signed "Tom House," and the other was signed "Gary Adornato." *Id.* Gary Adornato's note contained the defamatory statement, in relevant part: "[I]ndeed, as a possible result of [Joe Newton's] changes and omissions, we have learned that several of his customers have been hurt, and the reputation of our program has been impacted." *Id.* at 598. Based on this email and related testimony, the jury found in favor of PDI and against NPA on PDI's claim of defamation per quod and ordered $100,000 in compensatory damages. PDI requested a new trial premised on the court's refusal to instruct the jury that House ratified this defamatory conduct and so could be held personally liable. The district court denied this request, holding that the omitted instruction was not a correct statement of the law and did not impair PDI's theory of the case. PDI takes issue with both conclusions.

PDI argues that its omitted ratification instruction was a correct statement of the law. Under Kentucky law, defamation requires: (1) "a false and defamatory statement concerning another"; (2) "an unprivileged publication to a third party"; (3) "fault amounting at least to negligence on the part of the publisher"; and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281–82 (Ky. 2014). Ratification is after-the-fact approval of conduct. *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 874–75 (Ky. 2016). An employer's ratification of an employee's offensive conduct requires two elements: "(1) an after-the-fact awareness of the conduct; and (2) an intent to ratify it." *Id.* at 875 (citing *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 52–53 (Ky. 2008)).

PDI cites only one case, decided over 100 years ago, in which Kentucky courts applied the concept of ratification to defamation. In *Pennsylvania Iron Works Co. v. Henry Voght Machine*

*Co.*, a manager of Pennsylvania Iron Works wrote a libelous-per-se letter on company letterhead and signed the letter with the company's name, followed by his own name and title. 96 S.W. 551, 551–52 (Ky. Ct. App. 1906). The Kentucky court held that, despite a lack of evidence in the record of the express ratification of the letter by the company, the company failed to disprove or repudiate the letter after obtaining knowledge of its publication. *Id.* at 553. The court interpreted the company's failure to disavow the letter as ratification and found the company liable for the letter. *Id.* at 553–54; *see also Dossett v. N.Y. Mining & Mfg. Co.*, 451 S.W.2d 843, 845–46 (Ky. 1970) (explaining that the test for holding an employer liable hinges on showing either an agency relationship or that the employee was speaking within the scope of his employment); *see also Brewer v. Am. Nat. Ins. Co.*, 636 F.2d 150, 154 (6th Cir. 1980) ("[A] corporation is liable for defamatory statements made by its employees, if the statements are made within the scope of employment.") (applying Kentucky law). Even so, that does not mean a ratification instruction was proper here. The district court found that Gary Adornato was an agent and employee of NPA, not House. On appeal, PDI asserts that Adornato was an agent of House. But PDI cites no factual or legal support for this conclusory assertion. As the district court correctly noted, employees are not automatically agents of their employer-company's owner—this would conflict with the longstanding, axiomatic presumption that corporations are legal entities separate from their owners. *See, e.g.*, *United States v. Certain Parcel of Land in Wayne County*, 466 F.2d 1295, 1297 (6th Cir. 1972). PDI claims that Adornato was speaking on behalf of House, but this is belied by the fact that the email contains two different messages, one signed by House and the defamatory message signed by Adornato. The district court thus did not abuse its discretion in concluding that PDI did not and could not establish actual or apparent authority on House's behalf. We affirm the district court's refusal to pose the ratification instruction to the jury.

ii.

PDI also argues that the district court erred by refusing to allow the jury to consider whether House committed slander per se against PDI. In 2015, House allegedly told Bill Schopp, an NPA-certified coach, that PDI's Velocity Plus program was "hurting a lot of arms." DE 169-1, Schopp Dep., Page ID 3148, 3153. Schopp testified that he did not believe that Velocity Plus was causing injuries and that he was still in business with PDI. House denied that he had ever made the statement to Schopp that PDI's program was hurting players.

PDI requested the slander per se instruction and objected to its exclusion. The district court excluded it because Schopp, the individual who heard House's statement, continued to do business with PDI, and thus there was no harm done by the statement. *See* DE 162, Trial Tr., at 2923–25 ("I don't see based on that statement that there was any harm done by it because that individual who was the individual who heard the statement indicated that they continued to do business with him.").[9]

It is true, as PDI alleges, that slander per se does not require any allegation or showing of damages. *See Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981) ("Slander per se differs from ordinary slander in that the words themselves, absent any development of extrinsic facts or circumstances, are actionable."). "Under slander per se, the very nature of the defamatory utterance is presumptive evidence of the injury to reputation and of the

---

[9] PDI did not raise this slander per se argument in its renewed motion for judgment as a matter of law or new trial. NPA charges that, because PDI failed to raise the argument in that context, PDI has forfeited the argument on appeal. But Federal Rule of Civil Procedure 51, not Rule 50, governs requests for jury instructions. Under Rule 51, objections regarding jury instructions must be made at the trial level to be preserved for appeal. *Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 398 (6th Cir. 2008) (quoting *Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 427 (6th Cir. 1993)). Here, PDI requested the slander per se instruction and objected to its exclusion, thus PDI did not forfeit this claim for appeal.

ill will otherwise necessary to support a punitive award." *Id.* When there is a claim of slander per se, there is "a conclusive presumption of both malice and damage," and thus "the person defamed may recover without allegation or proof of special damages." *Disabled Am. Veterans, Dep't of Ky., Inc. v. Crabb*, 182 S.W.3d 541, 547 (Ky. Ct. App. 2005) (quoting *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004), *overruled on other grounds by Toler*, 458 S.W.3d at 287).

But Schopp's alleged statement that the Velocity Plus program was "hurting a lot of arms" was not slanderous per se. Words are slanderous per se when the words themselves "impute crime, infectious disease, or unfitness to perform duties of office, or tend to disinherit[.]" *Stringer*, 151 S.W.3d at 795 (quoting *Courier J. Co. v. Noble*, 65 S.W.2d 703, 703 (Ky. 1933); *see Calor v. Ashland Hosp. Corp.*, Nos. 2007–SC–000573–DG, 2008–SC–000317–DG, 2011 WL 4431143, at *4–5 (Ky. Sept. 22, 2011); *see also Crabb*, 182 S.W.3d at 547 (stating that words are slanderous per se when they "tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society") (quoting *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995)). PDI alleges that House's statement to Schopp imputes "unfitness to perform duties of office." But in *Calor*, the Kentucky Court of Appeals held that a statement made to Calor's employer that Calor had falsified her time records at the hospital was slander per se, because the statement tended to "'impute crime' or 'unfitness to perform duties of office.'" *Calor*, 2011 WL 4431143, at *4. And *Stringer* similarly found slander per se based on a handful of oral statements that insinuated plaintiff-employees had been stealing from the store-employer. *Stringer*, 151 S.W.3d at 792–93, 795. Kentucky precedent on whether words impute "unfitness to perform duties of office" thus often focuses on statements claiming theft or a crime of moral turpitude. An allegation that PDI's Velocity Plus program was "hurting a lot of arms" does not

track neatly onto this case law. Moreover, slander per se is a high bar; where "words themselves, absent any development of extrinsic facts or circumstances" are not slanderous, they do not meet this test. *See Columbia Sussex Corp.*, 627 S.W.2d at 274. Quintessential examples, as discussed above, involve falsely accusing someone of committing a crime or similar baseless accusations. *Calor*, 2011 WL 4431143, at *4; *Stringer*, 151 S.W.3d at 792–93, 795. The mismatch between Kentucky law and the facts here, combined with our deferential standard of review that requires a definite and firm conviction that the district court erred, *see Bisig*, 930 F.3d at 218, leads us to conclude that the district court did not abuse its discretion in rejecting PDI's slander per se instruction.

## IV.

For the reasons described above, we reverse and remand the jury's punitive damages award against PDI for a new determination under the correct standard, but otherwise deny each of PDI's other claims on appeal.